1   SEYFARTH SHAW LLP
    G. Daniel Newland (SBN 087965) dnewland@seyfarth.com
2   Jennifer P. Svanfeldt (SBN 233248) jsvanfeldt@seyfarth.com
    560 Mission Street, Suite 3100
3   San Francisco, California 94105
    Telephone: (415) 397-2823
4   Facsimile: (415) 397-8549

5   Attorneys for Defendant
    C&H SUGAR COMPANY, INC.

6

7

8                   UNITED STATES DISTRICT COURT

9          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                        C 07 3855 MEJ

11  C&H SUGAR COMPANY, INC.,            )   Case No.
                                        )
12            Plaintiff,                )   **PLAINTIFF C&H SUGAR COMPANY,**
                                        )   **INC.'S COMPLAINT TO COMPEL**
13        v.                            )   **ARBITRATION**
                                        )
14  SUGAR WORKERS UNION LOCAL NO. 1,    )
                                        )
15            Defendant.                )
                                        )
16  ─────────────────────────────────  )

17        Plaintiff C&H Sugar Company Inc. ("C&H" or "Plaintiff") hereby complains and alleges

18  as follows:

19                            **JURISDICTION**

20        1.    Plaintiff brings this action under Section 301(a) of the National Labor Relations

21  Act ("NLRA"), as amended, 29 U.S.C. Section 185(a), to enforce Defendant's obligation arising

22  under a written Collective Bargaining Agreement ("CBA") between Plaintiff and Defendant

23  Sugar Workers Union, Local 1 ("Union" or "Defendant") (collectively "the parties") to arbitrate

24  disputes between the parties thereto.

25        2.    This Court has jurisdiction over the subject matter of this action pursuant to 29

26  U.S.C. § 185(a) and 28 U.S.C. Section 1331.

27

28                                  1
    ─────────────────────────────────────────────
                 Complaint to Compel Arbitration

## VENUE

3.      Pursuant to Section 301(c) of the LMRA, 29 U.S.C. § 185(c), venue is appropriate in the Northern District of California, as the CBA between the parties was executed in this judicial district.  In addition, the events and/or omissions giving rise to the claims herein occurred in this judicial district.

## PARTIES

4.      Plaintiff is a corporation organized under the laws of the state of Delaware. Plaintiff operates, and at all times material, has operated a factory in Crockett, California, within this judicial district.  Plaintiff is an employer engaged in business activities affecting interstate commerce within the meaning of 29 U.S.C. § 152(2) and (7).

5.      Defendant is a labor organization within the meaning of 29 U.S.C. § 152(2), in that it exists for the purpose, at least in part, of representing employees, for collective bargaining purposes, who are employed in an appropriate bargaining unit.  Upon information and belief, Defendant's principal place of business is in Crockett, California.

6.      Venue is proper in this judicial district because the parties' business operations are conducted within this district and the collective bargaining agreement which is the subject of this action was entered into and executed in this District.

## CLAIM FOR RELIEF

7.      Plaintiff and Defendant, at all times material herein, have been parties to a written CBA.  The CBA governs the terms and conditions of employment for the C&H employees represented by the Union.  A true and correct copy of said CBA is attached hereto as Exhibit A.

8.      At all times material herein, Section XX of the CBA has contained a multi-step grievance procedure for the resolution of grievances brought by either the employer or the Union.  Said grievance procedure culminates in final and binding arbitration.  Section XX of the CBA states in relevant part:

When differences or complaints arise between Employer and the Union, or between Employer and any employee or employees, concerning changes made to existing working

1    conditions, the interpretation and application of this agreement, or a claimed violation of

2    this agreement, there shall be no suspension of work on account of such dispute, but shall
     be disposed of according to this Section."

3

4        9.    Section XX(B) of the CBA establishes the rule for "Employer Grievances."

5    Section XX(B), entitled "Employer Grievance" states:

6

7        Any grievance which the employer may have against the Union or any of its members
         shall be presented to the Union by the Manager of Human Resources or a designated

8        representative.  In the event that any such grievance is not satisfactorily adjusted within
         five (5) days after such presentation, or in the case of an alleged violation of Section XXI

9        within twenty-four hour (24) hours after such presentation, the Employer may demand
         arbitration

10

11       10.    On June 13, 2007, C&H, submitted an Employer Grievance to the Union Business

12   Agent Lawrence Ross ("Ross") for ongoing violations of Section XX(A) of the CBA. The

13   grievance requested that the Union properly adhere to the parties' agreed upon Grievance

14   Procedure, and that the Union respond timely to the Employer Grievance.  A true and correct

15   copy of the Employer Grievance is attached hereto as Exhibit B.

16       11.    On June 20, 2007, the Union responded to C&H's grievance with a letter from

17   Ross to C&H.  The letter stated, *inter alia*, "the Union disputes and disagrees with the grievance"

18   and that it "cannot be recognized as a legitimate grievance."  A true and correct copy of the

19   Union's response letter is attached hereto as Exhibit C.

20       12.    On June 20, 2007, the same day it received the Union's letter rejecting its

21   grievance, C&H sent the Union a Demand for Arbitration.  Specifically, C&H noted the parties

22   were "unable to satisfactorily adjust the grievance" and invoked their right to demand arbitration

23   under Section XX(B) of the CBA.  A true and correct copy of C&H's Demand for Arbitration is

24   attached hereto as Exhibit D.

25       13.    On June 22, 2007, the parties met to select on arbitrator for the Employer

26   Grievance and an unrelated Union Grievance.  After selecting an arbitrator for the Union

27   Grievance, the Union refused to select an arbitrator for the Employer Grievance.  Instead, the

28   Union submitted a correspondence, which stated, "the Union will respond to your demand for

arbitration within the timeframe outlined in the CBA." A true and correct copy of the Union's correspondence is attached hereto as <u>Exhibit E</u>.

14.    On June 22, 2007, C&H responded to the Union's refusal to select an arbitrator for the Employer Grievance. A true and correct copy of the C&H memorandum is attached hereto as <u>Exhibit F</u>.

15.    On June 25, 2007, the Union responded to C&H's June 22, 2007 letter, again stating that it "would respond to the companies [sic] demand for arbitration within the timeframe outlined in the CBA." A true and correct copy of the Union's correspondence is attached as <u>Exhibit G</u>.

16.    On July 2, 2007, C&H responded to the Union's June 25, 2007 correspondence and asked the Union to identify the "timeframe" the Union believed it had for responding to an Employer Grievance, as no "timeframe" is referenced in Section XX(B) of the Employer Grievance procedure. C&H also asked the Union to provide the specific section of the CBA, which would establish the supposed "timeframe." A true and correct copy of C&H's request for clarification is attached hereto as <u>Exhibit H</u>.

17.    On July 6, 2007, the Union responded to C&H's request in a one-paragraph memorandum by stating, "In response to your July 2, 2007 regarding the subject, the CBA states on page one (1) Witnesseth that the Employer is willing to recognize the Union as the representative of the employees. The Executive Board makes all of the decisions for the Union when the body is absent. The Executive Board will meet on July 10, 2007 at which time a decision regarding the issue will be made." A true and correct copy of the Union's July 6, 2007, memorandum is attached hereto as <u>Exhibit I</u>.

18.    Since July 6, 2007, the Union has not contacted C&H regarding its "decision" regarding the Employer Grievance.

19.    Under Section XX(B) of the CBA, if an Employer Grievance is not "satisfactorily adjusted" by the Union with five (5) days, the employer has the right to demand arbitration to resolve the grievance.

4

20.    C&H filed an Employer Grievance on June 13, 2007, and, after being told by the Union that it its grievance was not recognized, demanded arbitration on June 20, 2007.

21.    As of July 26, 2007, approximately forty-six (46) days after the Employer Grievance was filed, thirty-nine (39) days after C&H demanded arbitration, and sixteen (16) days after the Union Executive Board Meeting, the Employer Grievance has still not been "satisfactorily adjusted" and the Union still refuses to select an arbitrator.

22.    C&H has in good faith performed all of the conditions of the CBA on its part to be performed, and, in particular, has been and is ready to resolve the dispute in accordance with the CBA.

23.    Conversely, the Union has violated and continues to violate the terms of Section XX of the CBA. Specifically, the Union has failed and refused to comply with the Employer Grievance procedure and Plaintiff's timely requests to proceed to arbitration.

24.    Accordingly, arbitration is needed and required under Section XX of the CBA.

### REQUESTED RELIEF

WHEREFORE, Plaintiff respectfully requests:

1.    For an order directing Defendant to submit as soon as practicable the above grievance to final and binding arbitration with the terms of Section XX(D) of the CBA, entitled "Arbitration."

2.    For an order directing Defendant to reimburse Plaintiff for its reasonable attorneys fees and costs of suit; and

3.    Any such other and further relief as the Court may deem just and proper.

DATED: July 27, 2007                          SEYFARTH SHAW LLP


By _____
    G. Daniel Newland
    Jennifer P. Svanfeldt
    Attorneys for Defendant
    C&H SUGAR COMPANY, INC.

Complaint to Compel Arbitration

# EXHIBIT A

# AGREEMENT

between

C&H SUGAR COMPANY, INC.

and

SUGAR WORKERS
UNION NO. 1
SEAFARERS INTERNATIONAL
UNION OF N.A.
AFL-CIO

Effective

June 1, 2006

The AGREEMENT made and entered into effective the 1st day of June, 2006 by and between C&H SUGAR COMPANY, INC., hereinafter termed "Employer," and SUGAR WORKERS UNION NO. 1, SEAFARERS INTERNATIONAL UNION OF N.A. AFL-CIO, hereinafter termed "Union." This agreement is binding upon the Employer, its successors and assigns.

## WITNESSETH:

WHEREAS, satisfactory evidence has been submitted by the Union to the Employer that more than a majority of the employees of the Employer, in Crockett (excluding, however, warehouse employees, employees in the Cut-in Station and certain other employees hereinafter specifically excluded) have joined the Union and have designated the Union as their representative for the purpose of collective bargaining with the Employer, and

WHEREAS, the Employer is willing to recognize the Union for the aforesaid purposes and to deal with it as the representative of the said employees for the purposes of collective bargaining, it is agreed as follows:

## SECTION I

## WORK AND OCCUPATIONS

A. Work

Work covered by this agreement shall be all sugar refinery operations performed by employees of the Employer in Crockett, excluding work performed by employees of the Warehouse Department in the Warehouses and Cut-in Station.

B. Occupations

1. Occupations covered by this agreement shall be all occupations embraced within Section I A., but excluding, however, department managers, assistant department managers, superintendents, supervisors, foremen, assistant foremen, planners, assistant planners, schedulers, assistant schedulers, office employees of the Industrial Relations Department, professional employees, secretaries, and domestic servants in the Company House.

2. It is agreed that the Union shall have the right to bargain collectively for employees covered by this section while they are performing work as defined in Section I A. and for no other employees nor work.

3. Unless otherwise designated, the word "employee" or "employees" when used herein, means an employee or employees subject to the terms of this agreement and no others.

4. Employees who are not members of the bargaining unit shall not perform work covered by this agreement, except: (1) in an emergency, (2) when the safety of any employee is in jeopardy, (3) when conducting training which cannot be done by a bargaining unit member, or (4) to provide recess period and personal emergency relief for Security. (For definition of "emergency" see Section XXVIII.)

5. Members of the bargaining unit will provide "hands on" training on union jobs for relief supervisors up to the standard training time.

C. In administering the provisions of this agreement, no employee shall be discriminated against by the Employer or the Union because of race, color, religion, sex, age, veteran status, citizenship, national origin, disability, marital status or medical condition.

1

## SECTION III

### HOURS

**A. Work Day**

1. Eight (8) hours shall constitute a day's or night's work. Said 8 hours may not be staggered except that one meal period may be scheduled on employee's time. The meal period shall be one-half hour, except that a one-hour meal period may be scheduled when, in the judgment of the Employer, the work requirements of a job make such a schedule necessary.

b. Whenever it is necessary to change a one-half hour meal period to a one-hour meal period the employee involved will be given notice of such change on the previous day, if possible to do so. In the absence of such notice, the employee shall be compensated at time and one-half of the straight-time rate for the time worked after the normal quitting time on the first day the extended meal period is required.

2. Any employee working a shift with not more than eight (8) hours elapsed time from beginning to end of shift (ex, for example, the 7:30-3:30, 3:30-11:30 or 11:30-7:30 shifts) shall be given a 30-minute meal period on Employer's time or be entitled to the lunch period differential provided by Section X B.

3. Meal periods are to begin at not less than three (3) hours nor more than five (5) hours after the commencement of the shift.

**B. Work Week**

The work week is the 7-day period commencing at 11:30 p.m. Sunday and ending at 11:30 p.m. the following Sunday except for those employees who work a 4:30 p.m. to 1:00 a.m. shift; 8:00 p.m. to 2:00 a.m. shift; Maintenance Services Department employees who work a Monday to Friday schedule; and those employees who work on the reverse back-to-back schedule. For those employees, the workweek is the 7-day period commencing at 7:30 a.m. Monday and ending at 7:30 a.m. the following Monday.

**C. Recess Periods**

Each employee who heretofore has had recess periods shall be entitled to be away from the job for a recess of ten (10) minutes during each one-half (1/2) shift, with relief where such relief has been customary heretofore. Recess periods shall be scheduled as close to the middle of each one-half (1/2) shift as is reasonably practicable, subject to operating requirements. Only in the event of personal emergencies shall any employee exceed the ten (10) minute recess period or take more than one recess during each one-half (1/2) shift. (For definition of "emergency" see Section XXVIII.) Each employee shall report to his or her job (or shop in the case of the Maintenance Services Department), ready to receive work assignment, at the beginning of the shift and may not leave the job (or shop in the case of the Maintenance Services Department) either at the lunch period or quitting time until the appropriate time to do so.

3

---

D. If a situation arises where the Employer feels a reasonable accommodation for a disabled employee can or should be made under the Americans with Disabilities Act, the Employer will advise the union before taking any action. If Employer and the union disagree on what reasonable accommodations are to be made, such disagreements shall be resolved pursuant to Section XX of this agreement.

## SECTION II

### WAGES

1. Exhibit "B", attached hereto, sets forth the wage rate for each classification as of the effective date of this agreement. The wage rates include a back-to-back differential in the same amounts that were in effect on September 1, 1991, and which shall be payable only so long as back-to-back workweek operations continue.

2. All full-time, non-probationary employees on the payroll effective June 1, 2005, shall receive a one-time ratification bonus in the gross amount of $2000.00. This bonus shall not be part of the employee's regular rate. (Probationary employees as of June 1, 2006 shall be entitled to this bonus if they successfully complete their probationary period.)

3. Effective June 1, 2007 basic wage rates in effect on May 31, 2006 shall be increased by 3%.

4. Effective June 1, 2008 basic wage rates in effect on May 31, 2006 shall be increased by 3%.

7. In computing percentile adjustments to wage rates, the percentage shall be applied to the hourly rate and shall be rounded to the nearest whole cent.

8. Notwithstanding the foregoing, all employees hired on a daily rated job having less than twelve (12) months continuous service shall be paid at a rate which is 10% less than the rate shown for their job on the Exhibit "B" until they have completed twelve (12) months continuous service, at which time their rate shall be increased to the rate shown for their jobs on Exhibit "B".

9. A Christmas award will be paid in each year of the contract to all employees who are on roll on December 1. For those employees with five (5) years of service or working on a biweekly rated job for the entire year, the Christmas award will be calculated at 3 percent (3%) of the employee's annual straight-time salary based on the wage rate of the job the employee holds on December 1 of each year. For all other employees, the Christmas award will be based on the same formula used in 1978 and based on current rates. For purposes of wage comparisons only, the Christmas award will be identified and recognized as a wage item.

2

D. Work Schedules

1. Work schedules will be published from time-to-time by the Employer, as follows:

   a. General Operating Department schedule.

   b. Operations Departments - Skeleton Crew schedules, for shutdown periods which shall be published at or about the beginning of each operating period to cover the succeeding shutdown period.

   c. General Maintenance Services Department schedules, including Monday to Friday schedule, reverse back-to-back schedule and reverse 3 and 1 schedule.

   d. Maintenance Services Department - Supplementary schedules which shall cover work days for [1] shift groups, (2) operating mechanics, and (3) one Power Station Maintenance Men shall work the Monday to Friday schedule and one shall work the reverse back-to-back schedule depending on need.

   e. General Technical Operations Department schedule, covering all employees of the Technical Section except a certain designated group which works in accordance with the General Operating schedule.

   f. Industrial Relations Department - Special schedules will be prepared to cover all positions.

2. Revisions of these work schedules may also be published from time to time by the Employer. All work which conforms to these schedules shall be at straight-time rate of pay whenever 24 hours' notice of such revision is given.

3. A "schedule" is defined as the regularly established days of work and rest involved in a particular job or assignment.

   a. Noncontinuous job schedules consist of consecutive work days (holidays excepted), with two (2) scheduled days of rest, which may be scheduled either:

      (1) Before, or

      (2) After, or

      (3) Before and after the work period.

   b. Continuous job schedules apply to those jobs or assignments which must be performed in whole or in part on each day of the year with work days scheduled in accordance with past practice according to the particular job or assignment involved and with two scheduled days of rest.

5. No change in the established schedule for a job or an assignment may be made for the temporary convenience of an employee. A scheduled workday may not be taken off on "Personal Time" and the employee allowed to "make up" the day by working a day not included in the established schedule for the job or assignment.

6. Employees may request a flexible schedule subject to the following:

   a) Schedule must be approved by the department management.

   b) The flexible schedule will be in effect on a month to month basis subject to supervisory approval.

   c) Only straight day employees, working jobs that do not require a relief, will be eligible to work a flexible schedule.

   d) A flexible schedule will be limited to beginning no earlier than 2 hours before the regular shift start time and ending no later than 2 hours later than the regular stopping time.

   e) The approval or denial of the request for a flexible schedule is the exclusive right of the Company.

SECTION IV

BIWEEKLY PAY

Each employee who has completed five (5) years of continuous service with the Employer (on roll) irrespective of job classification, shall be transferred from the daily payroll to the biweekly payroll and thereafter shall be entitled to the appropriate benefits.

SECTION V

PREMIUM PAY

A. Overtime Work

1. Any work performed by an employee in excess of eight (8) hours on any shift or in excess of forty (40) straight-time hours in any workweek shall be at the overtime rate of pay.

   The overtime rate of pay shall be 1-1/2 times the regular straight-time rate of pay which means the employee's rate of pay while working non-premium or non-overtime hours or days.

2. An employee who works in excess of twelve (12) hours consecutively or in the same workday shall receive double the straight-time rate for all work in excess of twelve (12) hours.

3. A 7:30 a.m. to 4:00 p.m. day shift employee performing emergency work between 11:30 p.m. and 3:30 a.m. or after 3:30 a.m. if the work started prior to 3:30 a.m., will be given the equivalent number of hours worked between 11:30 p.m. and 7:30 a.m. off with straight-time pay on the following eight (8) hour day shift if it is scheduled day of work for the employee (whether as a regularly scheduled day of work or as overtime to be performed on a scheduled day of rest). The employee will be required to take this time off, and will have no option, that has to be exercised prior to leaving the refinery, of taking the time off at either the beginning or at the end of the following eight (8) hour day shift. However, if the emergency work cannot continue or beginning at 7:30 a.m., the foregoing will not apply except that if the employee takes the time off essential work of Employer is completed before the end of the employee's following day shift, then the provision for hours worked between 11:30 p.m. and 3:30 a.m. or after 3:30 a.m. if the work started prior to 3:30 a.m. not in excess of the hours remaining in the shift will be given off with pay at the end of the shift. (For definition of "emergency" see Section XXVIII.)

   The provisions of this section applicable to employees working a 7:30 a.m.-4:00 p.m. day shift do not apply to those employees working on a rotating shift.

4

5

## B. Work on Scheduled Days of Rest

1. Whenever any employee is required to work on a scheduled day of rest, the employee's pay for such work shall be governed by the following conditions:

   a. When no change of schedule is involved, time and one-half shall be paid for all work performed on any of the scheduled days of rest. Such time worked, up to eight (8) hours in each day shall be counted toward the forty (40) hours in the work week after which weekly overtime is paid.

   b. When and if refinery operations are curtailed, resulting in less than five (5) scheduled work days per week, an employee working a day other than one of the two normally scheduled rest days (holiday and day scheduled off in lieu of holiday excepted) shall receive straight-time pay provided at least forty-eight (48) hours (two (2) calendar days) notice is given prior to commencing work on such day. When such notice is not given, the overtime rate of pay will apply. Whenever a holiday occurs during a shutdown weekend and as a result thereof the plant starts up on Thursday, instead of Wednesday, employees who are called in for the start-up on 3:30-11:30 shift Wednesday shall receive the overtime rate of pay.

   c. An employee may be changed from one schedule to another without the payment of overtime, provided the employee is given forty-eight (48) hours' (two (2) calendar days) notice of such change prior to the start of the new work week. In the event of failure to give such notice, the change will be covered as in d. below.

   d. An employee may be changed from one schedule to another within the work week. The schedule under which the employee starts the work week governs the day or days of rest for that week, and if any work is performed on such scheduled days of rest the employee shall be paid at the overtime rate.

   e. The normal quitting time for any Maintenance Services Department employee on the operating schedule who performs work on a day of rest on their own station will be the same quitting time as on a regularly scheduled day of work.

## C. Work on Holidays

1. All employees shall receive (in addition to holiday pay to which they may be entitled under this agreement) time and one-half the regular straight-time pay for work performed on the holidays specified in Section VII hereof.

2. When work on noncontinuous jobs is scheduled to be performed on a holiday, Employer will first attempt to secure volunteers from among currently qualified employees. Employees will be ordered to work only if there are insufficient qualified volunteers.

3. Except where an employee has volunteered for such work, Employer will, whenever possible, give forty-eight (48) hours' notice to any employee holding a noncontinuous job who is required to work on a shutdown Friday which is a recognized holiday.

4. If an incumbent on a continuous job makes a request not to work on a holiday, the Employer will attempt to obtain a relief for that employee.

## D. Shift Changes

1. When it is necessary to change an employee from one shift to another, the employee will be given notice of such change twenty-four (24) hours prior to the commencement of the new

6

shift, if possible to do so. In the absence of such notice, the employee shall be compensated at time and one-half of the straight-time rate for the first day of work on the new shift. This provision shall not apply, however, under the following conditions:

   a. When an employee is changed from the 7:30-4:00 to 7:30-3:30, or vice versa.

   b. When an employee is changed from one shift to another to fill a posted job (other than the one the employee is then occupying), for which the employee has applied and has been appointed.

   c. When employees change shifts at their own request.

   d. When an employee is changed from one shift to another for the purpose of serving on or attending any Union Committee or meeting or at the request of any union representative.

2. Double Back

   Time and one-half of the straight-time rate will be paid on the first day for a scheduled change of shift that results in less than 16 hours (excluding overtime) between the end of one scheduled eight-hour shift and the beginning of the new eight-hour shift.

   This clause does not apply to changes in shift related to the 8-2-4 or 9-1-4 operating method or to a shift change as a result of a request by an employee.

## E. Five (5) Hours Without a Meal

Any employee who is required to work more than five (5) hours without a meal shall receive overtime for all work performed in excess of five (5) hours at 1-1/2 times the straight or overtime rate, as the case may be.

## F. Staggered Hours

Any employee whose hours are staggered after the starting shift shall be paid overtime for all hours worked after the expiration of their normal working day.

## G. Computation of Premium Pay

All overtime and premium rates provided for in this agreement are based on regular straight-time rates of pay and, except for Paragraph E. of this section nothing herein calls for payment of one overtime or premium rate based on another overtime or premium rate.

# SECTION VI

# ASSIGNMENT OF OVERTIME WORK

## A. Minimum Guarantee

1. Any employee required to work overtime following a meal period shall be given a minimum of two (2) hours overtime work and shall receive a minimum of two (2) hours overtime pay provided the employee is notified of such overtime assignment prior to scanning out on the payroll system.

2. The scheduling of less than two (2) hours of overtime immediately adjacent to an employee's shift shall not be affected by the foregoing paragraph.

7

**B. Notice Required**

1. If an employee, while on the job, is assigned to work overtime following the employee's shift, the employee shall be given as much notice as is possible, and in any event not less than two (2) hours notice of such assignment, except in cases of emergency, when the employee shall be given as much notice as is possible under the circumstances. An employee compelled to work overtime in the absence of an emergency, who is not given the notice required by this section, shall be compensated as the Arbitrator may determine. (For definition of "emergency" see Section XXVIII.)

2. If an employee has been notified before the start of their shift of an overtime assignment to commence at the end of such shift, and if, for reasons beyond the Employer's control, overtime work is not available, the scheduled overtime not worked unless notice that the overtime work will not be available is given not less than one-half (1/2) hour before the overtime was scheduled to commence.

b. An overtime assignment scheduled to precede a scheduled shift may be cancelled without penalty by giving at least two (2) hours' notice before the overtime assignment was scheduled to commence. If such an overtime assignment is cancelled with less notice the employee will receive straight-time pay for any scheduled hours of overtime which are not worked.

c. When an employee has been notified during their shift of an overtime assignment to begin at the end of that shift, the overtime assignment may be cancelled without penalty by giving at least one-half (1/2) hour notice prior to the end of the shift. If such an overtime assignment is cancelled with less notice, the employee will receive straight-time pay for any scheduled hours of overtime which has not been worked.

**C. Overtime Rotation and Equalization**

1. If Employer desires overtime work to be performed, the work shall be offered to eligible employees in the order of the applicable overtime rotational or equalization list. Employees may decline overtime so offered, provided that if insufficient qualified employees have accepted the offered overtime, then Employer may direct those employees standing at the head of the applicable list, up to the number of employees needed, to accept the overtime assignment. However, an employee shall not be required to accept an overtime assignment when compelling personal considerations of an unusual and emergency nature exist. (For definition of "emergency" see Section XXVIII.)

2. Overtime rotational lists will be maintained as in the past, and Employer will make every effort to rotate overtime assignments in an equitable manner among those who are eligible for them by limitations of overtime will be counted among members of that group. Overtime on non-posted jobs will first be offered among the employees in the group who normally performed work. If there are insufficient volunteers from within that group, the overtime will be offered on a rotational basis to the posted job incumbents on that station who can perform such work without training, before going off station. Each supervisor will keep a record of the overtime worked by employees under their supervision. This record will be available for the inspection of the employee or Union representative upon request.

3. The filling of vacancies will be done by using straight-time labor whenever possible. If it is necessary to use overtime to cover a vacancy, it will be first offered to the incumbents then performing the function. If one of the incumbents does not want to work 12 hours, an

employee from another area who is qualified will be assigned on straight time and overtime used on that job to cover the 4 hours.

No employee will be scheduled or have the right to work 16 hours unless the function cannot be covered any other way.

4. The overtime equalization list will be followed in the maintenance department and all refusals properly recorded.

5. If errors occur in the assignment of overtime, every effort will be made to provide, within thirty (30) days, at a time mutually agreeable between the Employer and employee, an overtime assignment of equivalent number of hours, which will not supercede another employee of an overtime assignment. If such overtime assignment is not made within thirty (30) days, the Employer will pay the employee straight-time pay for the equivalent number of hours of overtime lost.

**SECTION VII**

**HOLIDAY PAY**

A. The recognized holidays are as follows:

| | |
|---|---|
| New Year's Day | Personal Holiday |
| Easter Sunday* | Labor Day |
| Memorial Day | Thanksgiving Day |
| Fourth of July | Christmas Day |

*For employee who are not scheduled to work on Easter Sunday, Good Friday will be the holiday.

The personal holiday will be scheduled by mutual agreement between the Employer and the employee. Each eligible employee will have an option of taking the personal holiday or taking cash in lieu of the holiday. On November 1 of each year, every employee that has not taken the personal holiday, scheduled it, or taken cash in lieu thereof, will have until November 15 to schedule the personal holiday or receive cash in lieu thereof.

In addition to the above holidays, there shall be three (3) "floating holidays" to be designated by Employer prior to February 1 of each year. The floating holidays will be scheduled (to the extent operating requirements permit) to give long weekends and/or avoid one day shutdowns.

B. Holiday pay in the amount of eight (8) hours straight-time shall be paid for each of the holidays specified above to each employee who has been "on call" for more than six (6) months subject to the following conditions:

1. Holiday pay shall continue as in the past to be paid for holidays falling on regularly scheduled shutdown days between operating periods.

2. Holiday pay shall be paid for holidays falling during a period of excused absence of a two-(2) work period or less.

3. Holiday pay shall be paid during absences on account of verified illness or injury.

4. Holiday pay shall not be paid for a holiday occurring while an employee is on a leave of absence.

5. Holiday pay shall not be paid to members of SWU #1 for holidays which fall during a period in which SWU #1 is on strike against the Employer.

6. Holiday pay shall not be paid to any employee who fails to work on a holiday when ordered to do so.

7. Holiday pay shall not be paid to daily rated or five-(5) day biweekly employees who fail to work because of personal absenteeism on their scheduled work days immediately preceding and immediately following the holiday, unless such absence on one or both of such days has been authorized in advance by their supervisor.

C. Whenever any of the holidays specified above fall on a Saturday which would have been a scheduled day of rest, in the absence of the holiday, the Friday preceding shall be considered the holiday for all purposes of holiday and overtime pay.

D. Whenever any of the holidays specified above (other than Easter Sunday) falls on a Sunday, the Monday following shall be considered the holiday for all purposes of holiday and overtime pay.

E. Any of the recognized unworked holidays for which an employee is eligible and is paid holiday pay shall be considered as eight (8) hours of straight-time worked for the purpose of computing overtime after forty (40) hours.

## SECTION VIII
## REPORT PAY

A. A minimum of four (4) hours straight-time shall be paid to any employee who reports for duty pursuant to orders.

B. An applied to work in excess of eight (8) hours per day, the foregoing clause applies solely to emergency call-ins which were not scheduled prior to the employee's quitting time and to assignments which are scheduled to begin more than one (1) hour after the employee's quitting time. [For definition of "emergency" see Section XXVIII.]

C. When an employee reports for work following an absence from which the date of return is unknown to the Employer, the employee may be sent home without pay unless the employee has given the Employer at least four (4) hours notice before reporting for work.

## SECTION IX
## SEVERANCE PAY

A. If an employee with three (3) or more years of continuous service is laid off because of equipment or methods changes (including an employee who is laid off because of a change in another employee's job), the employee shall be entitled to severance pay equal to one (1) week's wages for each full year of employment, partial years in proportion, plus an amount equivalent to two (2) weeks' wages. If an employee with three (3) or more years of continuous service is assigned to a different job because of an equipment or methods change affecting their job, and if (1) the job to which transferred is a lower rated job, and (2) the employee is not offered rate protection as hereinafter defined, then such employee shall be entitled to severance pay equal to one (1) week for each full year of employment, partial years in proportion, plus an amount equivalent to two (2) weeks' wages. An employee entitled to severance pay may elect to receive such pay at any time on or before the 180th day from their date of layoff or from the date on which they are assigned to a different job because of an equipment or methods change affecting their job. Receipt of severance pay shall eliminate employee status for all purposes of this agreement. An employee shall have "rate protection" whenever their rate of pay equals or exceeds the rate of pay which they were receiving immediately prior to their transfer, whether such rate of pay is a personalized "red circle" rate or the contractual rate for the job to which they are assigned.

B. A First Class Journeyman with two (10) or more years continuous service who, because of a reduction

of personnel in their craft, is transferred to another job may (unless the job is a craft position of equal pay for which a vacancy exists) refuse such transfer and elect instead to accept severance pay. Severance pay shall equal one (1) week's wages for each full year of service, partial years in proportion, plus an amount equivalent to two (2) weeks' wages. Receipt of severance pay shall terminate employee status for all purposes of this agreement. Application for severance pay shall be made within two (2) weeks after the employee is given notice of proposed transfer; failure to apply for severance pay within such two-(2) week period shall constitute acceptance of transfer.

## SECTION X
## DIFFERENTIALS

A. Shift Differential

1. Shift employees shall receive a fixed daily shift differential of $3.00 when working the 3:30pm – 11:30pm shift and $4.50 when working the 11:30pm – 7:30am shift."

Note: Shift employees working the 7:30a.m. – 3:30p.m. shift will be eligible for shift differential pay if they stay over into the 3:30p.m. – 11:30p.m. shift or work overtime hours prior to the start of such shift. Shift employees working the 3:30p.m. – 11:30p.m. shift will not be eligible for shift differential pay for any hours worked prior to the beginning of their shift. Shift employees working the 11:30p.m. – 7:30a.m. shift will not be eligible for shift differential pay for any hours worked beyond 7:30a.m.

2. Shift differential shall be considered as a part of the "basic wage" only for purposes of calculating overtime earnings and vacation pay. Vacation pay shall include the shift differential which would have been paid had the employee worked at straight-time on the shift(s) to which they would have been assigned but for the scheduling of vacation.

3. Shift differential will be applied to the straight-time hours as well as the premium hours.

B. Lunch Period Differential

On shift jobs where it is necessary for the performance of their regular duties, a differential of $2.50 per day shall be paid in the employee pay check.

## SECTION XI
## MEAL ALLOWANCE

Whenever employees are required to work two (2) hours overtime or longer immediately before or after their shift, they will be paid $5.00 for a meal. This will be paid in the employee pay check.

## SECTION XII
## VACATIONS

A. Vacation Allowance

1. Vacation allowance shall be credited to "on roll" employees on January 1 of each year for all months worked in the year prior thereto.

2. Annual vacation allowance for employees hired prior to June 15, 2006 shall be:

a. For all employees with less than twelve (12) months credited service, a pro rata vacation based on number of months worked in the previous year; except that no employee shall be eligible to take any vacation until they have completed six (6) continuous months "on

roll."

b. For those with twelve (12) months but less than ten (10) years continuous service, ten (10) work days off with pay.

c. For those with ten (10) years but less than fifteen (15) years of continuous service, fifteen (15) work days off with pay.

d. For those with fifteen (15) years but less than twenty-five (25) years of continuous service, twenty (20) work days off with pay.

e. For those with twenty-five (25) years or more of continuous service, thirty (30) work days off with pay.

3. Annual vacation allowance for employees hired after June 15, 2006 shall be:

a. For those with twelve (12) months but less than ten (10) years continuous service, ten (10) work days off with pay.

b. For those with ten (10) years but less than fifteen (15) years continuous service, fifteen (15) work days off with pay.

c. For those with fifteen (15) years or more of continuous, twenty (20) work days off with pay.

4. The above vacation allowances are subject to adjustments provided in Paragraph C.

5. Vacation pay allowance shall be based on:

The straight-time job rate the employee had at the time their vacation commenced, plus the shift differential applicable to the shift(s) the employee would have worked but for the scheduling of vacation.

6. Employees laid off for lack of work and subsequently recalled within 180 days shall be eligible for the same vacation as if they had been on roll during the layoff period less a pro rata adjustment for each calendar month held off and less any part of the vacation previously paid at time of layoff. In computing such vacations for portions of a calendar month on roll, fifteen (15) days or more on roll in a given calendar month shall be counted as one calendar month; less than fifteen (15) days on roll within a given calendar month shall not be counted toward vacation.

7. Employees on long-term disability benefits shall not be eligible for vacations or vacation allowance.

B. Vacation Periods

1. Vacations may be scheduled at the sole discretion of the Employer, except that an employee entitled to two (2) weeks vacation or less shall be required to take such vacation before June 1 or after September 30. Employees entitled to more than two (2) weeks vacation may be required to take the portion in excess thereof outside this period, at times more convenient to the Employer. Employees with twenty (20) or more years of service may, but not more often than once every four (4) consecutive weeks of vacation during the period June 1 through September 30. Employer shall grant such requests to the extent practicable. Not more than 1/5th of the employees from any department, craft or other group whose vacations usually affect one another and who are eligible for such four(4) consecutive-week vacations, shall be granted such vacations in any one year.

2. Banked vacation may be taken in one (1) hour increments in accordance with Section XII, B.4.a.

3. Vacation periods, once scheduled by the Employer or at the request of an employee, may be changed by the Employer or an employee only upon two (2) weeks' notice prior to the date the vacation was scheduled to commence, unless shorter notice is mutually agreeable to the employee and the Employer.

4. Vacation Banking

a. Employees may bank all but one week of their vacation, one week at a time. Banked vacation can be taken at a mutually agreeable time in 1 hour to 3-day increments. Normally, advance notice of no less than two (2) days must be given when banked vacation is desired to allow for relief labor scheduling.

b. Overtime may be used if necessary to relieve those requesting banked vacation.

c. Any scheduled week that an employee, at a later date elects to bank, will not be available to other employees to reschedule their vacation. However, the Company will review requests as in the past and if the move is made without making multiple moves as a result of that request, it may be granted. This will be up to the discretion of the department manager.

d. Time in the vacation account will not be cumulative and any balance remaining at the end of the year will be paid in cash.

5. Employees may opt to receive cash in lieu of scheduled vacation for all earned vacation in excess of one week. Employees must declare their intention in lieu of vacation in January of each year. Employees may receive cash in exchange for vacation in no less than five-day increments. Any scheduled week of vacation that has been scheduled, will not be available to other employees to reschedule their vacation. However, the Company will review requests as in the past and if the move is made without making multiple moves as a result of that request, it may be granted. This will be up to the discretion of the department manager.

C. Adjustments

Employees who have been "on roll" the required period are subject to the following conditions which affect their vacation allowance:

1. Leaves of Absence

Employees on roll five (5) years or more: After five (5) years "on roll" leaves of absence not exceeding three (3) months duration in any twelve (12) calendar months will not count as lost time. Leaves of absence exceeding three (3) months' duration in any twelve (12) calendar months will disqualify the employee to the extent of one (1) day of vacation for each month of leave in excess of three (3).

Employees on roll less than five (5) years: Employees with less than five (5) years of service will have leaves of absence counted as "lost time," forfeiting 5/6th of one (1) day of vacation for each month on leave.

2. Sickness

the employee is on leave of absence, layoff, or sick leave.

For the purposes of this provision, the immediate family shall be restricted to father, mother, brother, sister, spouse, child, mother-in-law, father-in-law, grandparents, grandchildren, stepparents, stepchildren, sister-in-law, brother-in-law and grandparents-in-law. At the request of the Employer, the employee shall furnish a death certificate and proof of relationship.

Funeral leave applies only in instances in which the employee attends the funeral, or is required to make funeral arrangements, but is not applicable for other purposes such as settling the estate of the deceased.

## SECTION XIV

## EMPLOYMENT, ADVANCEMENT AND RETENTION

A. Governing Policy

The long standing policy of the Employer with respect to employment, transfer and retention of employees shall continue. The Employer, when promoting employees, shall give due consideration to (1) individual merit, (2) physical, moral and mental capacity and general fitness, (3) length of service with the Employer, and (4) qualification. Wherever employees have equal qualifications for promotion, the employee having seniority shall have preference.

B. Determination of Seniority

1. Probationary Period

    a. All new employees shall be regarded as probationary employees during the first one hundred and twenty (120) working days of employment. A probationary employee shall have no seniority rights and retention as an employee is entirely within the discretion of the Employer.

    b. When extra operating days are worked by a probationary employee, the time worked will be credited towards the probationary time of the employee.

    d. Not more than five (5) days absence for any reason will be credited toward computing the one hundred and twenty (120) working days of the probationary period; however, a probationary employee may not complete the probationary period while absent.

    e. At the end of the probationary period the employee shall be classified as a regular employee with plant seniority computed from the date hired.

2. Appointment Seniority

Seniority on posted jobs shall commence on the date of selection.

C. Reduction in Forces

1. Decrease in Department and Craft Personnel

Reduction in personnel in any department or in any craft shall be made by transfer in the reverse order of appointment or craft seniority, except that employee possessing needed skills of filling jobs which cannot be adequately performed by other employees may be retained regardless of such seniority. Employees so transferred shall be assigned to other jobs in accordance with previously acquired appointment seniority, or if no such seniority has been

15

---

Time lost by reason of sickness or injury, not in excess of ninety (90) working days, shall not constitute a forfeit against any vacation allowance. Time lost for such reasons in excess of ninety (90) working days (other than injury covered by workmen compensation liability of C&H) shall count as lost time, forfeiting one (1) day of vacation for each month of such lost time.

3. Union Action

Time lost by reason of action of the Union shall be considered as "lost time", forfeiting one (1) day of vacation for each thirty (30) calendar days of such time lost.

4. Personal Time Off

Time lost by reason of occasional days off on personal time shall not constitute a forfeit against any vacation allowance.

D. Termination of Employment

Employees eligible to take a vacation who terminate their employment shall receive all vacation allowance accrued between date of termination and January 1 of the previous year, less any vacation allowance already received for such period and less any disqualifying time.

E. Miscellaneous

1. Vacations shall not be cumulative from year to year, except that:

    a. An employee who, because of sickness or injury, becomes unable to work prior to commencing their vacation for a given year, and whose sickness or injury extends continuously into the next calendar year, shall take their vacation for the prior year at a time convenient to the Employer and before June 1 or after September 30.

    b. An employee with fifteen (15) or more years of service may postpone all or part of vacation allowance in any one year for the sole purpose of taking an extended vacation in the following year, subject to these conditions:

        (1) The accumulated vacation must be taken consecutively with current earned vacation.

        (2) No more than two (2) weeks of the total vacation may be taken during the preferred period. An exception may be granted if agreeable to the Employer.

        (3) That portion of an accumulated vacation that has been carried over from a previous year shall be at the vacation pay rate of year in which the vacation is taken plus the shift differential that would have been paid but for the vacation.

2. Whenever the vacation period of any employee includes one of the recognized holidays, they shall receive an additional day of vacation which shall be scheduled by the Employer either immediately before or after the vacation period.

## SECTION XIII

## FUNERAL LEAVE

In the event of a death in the immediate family of an employee who has one (1) or more years of service with the Company, such employee shall, upon request, be granted such time off with pay as is necessary to make arrangements for the funeral and attend same, not to exceed three (3) regularly scheduled working days for in-state funerals and five (5) regularly scheduled working days for out-of-state funerals. This provision does not apply if the death occurs during the employee's paid vacation, or while

14

acquired, may have the opportunity of replacing employees with lesser plant seniority on non-posted base rate jobs in the Packaging or Process Departments. This clause does not apply to employees with less than one (1) year seniority.

2. Individual Layoffs

a. Individual layoffs which are necessary after the operation of the foregoing clause shall be made in the reverse order of plant seniority from the department, or departments in which such layoffs are necessary.

b. The customary five-(5) day notice of layoff shall not be required with respect to employees who are not on duty at the time of the layoff.

c. Such employees who have been so laid off shall have priority over other applicants for employment, and shall be rehired in the reverse order of the layoff.

d. (1) Layoffs for less than 180 consecutive calendar days shall not constitute a break in service and every employee rehired without a break in service shall be credited with accumulated plant seniority.

(2) An employee who is laid off will retain posted job rights for up to 180 days of layoff and will not have appointment seniority dates adjusted upon recall unless the job has been posted in the interim, in which case appointment seniority will be adjusted to date of recall.

3. Work During Extended Plant Shutdown

a. Jobs which must be performed during an extended plant shutdown, shall be assigned to employees on the basis of plant seniority, without regard to department, provided such employees are capable of performing the required work without additional training.

At least 72 hours prior to an extended plant shutdown, the Company will meet with the Union and review the jobs to be performed and employees to be assigned to such work. A notice will be posted at least 48 hours before the end of each schedule prior to an extended plant shutdown. Such notice will show which jobs are scheduled to be performed during the extended plant shutdown and those employees scheduled to perform the jobs. No claims for pay because of errors in such assignment can be made if the error is not reported to the Company prior to the end of the last shift preceding the shutdown period.

If an employee refuses the opportunity to work during a plant shutdown, the Employer is not obligated to ask that employee to work on any other job unless subsequent to that employee becomes available within that employee's department for which that employee is qualified.

b. When operations are started following an extended shutdown, employees will be called back according to station and department requirements.

4. None of the foregoing provisions shall apply to the President of the Union, who shall be retained as long as work, which they are qualified to perform, is available at their wage rate in their department. If they are not qualified to perform the work, which is available at their wage rate, they shall be assigned to other available work which they are qualified to perform.

D. Unfair Discharge

If the Union believes that any employee has been discharged unfairly, the Employer agrees, when called upon, to discuss the discharge through the Grievance Procedure herein provided for.

16

E. Supervisors Promoted from Bargaining Unit

1. Appointment to Supervisory Positions

Employees who receive permanent appointments to supervisory positions will be issued withdrawal cards from the Union as of the date of the appointment.

2. Voluntary Return to the Bargaining Unit

Bargaining unit employees promoted to a supervisory position lose all rights to return to the bargaining unit and all seniority after 90 days

3. Involuntary Return of Supervisors to Bargaining Unit

a. Any permanent supervisor appointed before June 1, 1974, who is transferred back to the bargaining unit because of a permanent reduction in the supervisory force will be transferred to the job to which they are entitled based on their adjusted seniority except that their appointment seniority on that job will be (i) their adjusted appointment seniority, or (ii) an appointment seniority immediately junior to that of the most junior employee then within the group of regular incumbents in that job whichever of (i) or (ii) calls for the lower seniority. For example, if such an employee is transferred back to Millwright Electrician, they will hold craft seniority below all employees then assigned to the Electrical Craft. Similarly, if they are transferred back to an Operations Department job they will have appointment seniority and station seniority below that of all then regular incumbents.

Their appointment seniority rights on all other posted jobs will be junior to all other employees holding seniority rights to such jobs on date of return to the bargaining unit.

b. Any relief supervisor who is appointed permanent supervisor on or after June 1, 1974 and who is involuntarily transferred back to the bargaining unit because of a permanent reduction in the supervisory force within the three-(3) year period following their appointment shall have seniority rights as described in subparagraph a. above.

c. Supervisors will not be transferred to positions under Union jurisdiction because of temporary plant shutdowns or temporary curtailment of the operations of any craft or station.

4. No Union member will work as a relief supervisor.

5. Definition of Adjusted Seniority

For all purposes of this subsection E., "adjusted seniority" is the seniority established by an employee while within the bargaining unit.

In the case of an employee who returns to a job within the bargaining unit, their plant, station, craft and appointment seniority dates shall, where appropriate, be computed by advancing such dates by the period of time during which the employee was not within the bargaining unit, and the seniority dates so computed shall be employee's "adjusted seniority" dates. These "adjusted seniority" dates may not be used for bidding on job postings for a period of 180 working days from date of return to the bargaining unit. During such 180 working-day period the employee, for job posting purposes, will be considered to have a seniority date which is the same date as their date of return to the bargaining unit.

17

## SECTION XV

### NEW MACHINERY, EQUIPMENT AND METHODS

A. Employer shall have the right to utilize new machinery and equipment during the term of this agreement and Union shall not interfere with such right. This right shall be subject to the following provisions of the section.

B.

1. Prior to a different type of machinery or equipment being placed into operation, or the making of a basic change in a job, including a change in work method, technological or experimental change, Employer shall inform the Union of the rules, wages and working conditions Employer plans to establish for such operation and the approximate date they will go into effect. Such notice to the Union shall be made no less than ten (10) days prior to the change and where reasonably practicable to do so longer notice shall be given, but in no case more than sixty (60) days.

2. At Union's request, a meeting with Employer shall be held following above notification to discuss the proposed rules, wages and working conditions. Unless otherwise agreed to beforehand, such meeting shall be restricted to not more than three (3) representatives of Union and three (3) representatives of Employer.

3. In the event the Union deems that a different type of machinery or equipment has been placed into operation, or a basic change made in a job, including a change in work method, technological or experimental change, and the Employer has not followed the procedures established in B. 1. and 2., the Union may refer the issue directly to the Third Step of the Grievance Procedure.

C. The Employer's rules, wages and working conditions (except where modified by the Employer during the trial period as the result of experience gained during the trial period) shall stay in effect for a thirty-(30) working day trial period. This trial period can be shortened or extended when mutually agreed to by both the Union and the Employer. The Union shall have the right to have its representative evaluate and study such operation during the trial period.

D. If at the end of the trial period the Union is dissatisfied with the rules, wages and working conditions, the Union may, within fifteen (15) days following the termination of the trial period, request a meeting with the Employer for the purpose of negotiating the open issues. If agreement cannot be reached, the Union may have the fairness of the rules, wages and working conditions reviewed by an Arbitrator, who shall be selected as provided in Section XX.

E. The Arbitrator shall review the rules, wages and working conditions to determine whether they are reasonable and fair as compared with the rules, wages and working conditions agreed to by parties for other jobs within Union's jurisdiction. If the Arbitrator decides that a change or changes in the rules, wages or working conditions is required in order to make them reasonable and fair under such standard, such change or changes shall be binding upon the parties, and any change in wages shall be made retroactive to the beginning of the trial period.

F. If, subsequent to the Arbitrator's decision, further changes or improvements are made in the operation of the machinery or equipment that affect the reasonableness and fairness of the rules, wages or working conditions, the Employer may modify the rules, wages and working conditions previously reviewed or established by the Arbitrator and establish a new trial period. Under these circumstances, and if the Union is dissatisfied with the new rules, wages and working conditions, the Union shall have the same procedures available as in the case of the first trial period.

18

## SECTION XVI

### MECHANIZATION OPTION

A. It is recognized that equipment or methods changes may result in the elimination of jobs or a decrease in the number of employees required to perform a given job. When a layoff is impending because of equipment or methods changes, a special early retirement option will be made available under the terms and conditions outlined in Paragraph B. below. This option is not available if an impending layoff is due to decreased melt, or decrease or change in sales requirements, or for any reason other than equipment or methods changes.

B. This option is available only to employees who have attained age 55 and who have completed thirty (30) full years of service.

1. On the first day of any month during which equipment or methods changes will require a layoff, a notice will be posted on Employer's bulletin boards specifying the number of employees to be affected and the department(s) from which applications will be selected.

2. Applications will be accepted from eligible employees within the department in which the equipment or methods change occurs for a period of fifteen (15) days after the posting of such notice.

3. From applications so received a number of employees from the department in which the equipment or methods change occurs, equivalent to the number of employees who would otherwise be laid off (irregardless of department from which layoff occurs) will be selected to receive this option.

4. If insufficient applications for this option are received under Paragraphs 2. and 3. above, then additional applications will be accepted from eligible employees within the department from which the layoff occurs.

5. If insufficient applications for this option are received under Paragraphs 2., 3. and 4. above, then additional applications will be accepted from eligible employees in other departments.

6. From applications so received under Paragraphs 2., 3., 4. and 5. above, a number of employees equivalent to the number of employees who would otherwise be laid off will be selected according to plant seniority for special retirement with a monthly benefit (excluding pension plan benefits) of $100 from date of special retirement until attainment of age 65 or until 36 monthly payments have been made, whichever occurs first. Any employee selected for this option may elect to retire under the early retirement provisions of the pension plan or to defer their pension until attainment of age 65, but in either event such employee shall be considered as retired immediately upon commencement of the $100 monthly payment.

7. If insufficient applications for this option are received, then the required number of employees will be laid off under Contract Section XIV C. which governs reduction in force.

## SECTION XVII

### UNION SHOP

Only members in good standing in the Union shall be retained in employment. For the purposes of this section, "members in good standing" shall be defined to mean employee members in the Union who tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership. Non-members of the Union hired by the Employer must complete membership affiliation in or immediately following the date of hire, and the Union agrees to accept said non-members into

19

SECTION XVIII

CHECK-OFF OF UNION DUES

A. The Employer agrees that it will deduct from the pay of each "on-call" employee covered by this agreement, provided that a written and authorized assignment in the form hereinafter provided is in the possession of the Employer at the time of such deduction, Union initiation fees and membership dues, subject to the procedure as set forth in the succeeding paragraphs of this section.

B. It is agreed that membership dues and initiation fees shall be deducted from employees' pay as provided in the "Assignment of Wages" set forth in Paragraph G. below.

C. The total amount so deducted pursuant to such assignments shall be transmitted to the Union by check drawn to the order of SWU #1 monthly after the deductions are made. Upon the issuance of a receipt to the Employer by the Union, and the issuance of a receipt by the Union, all responsibility on the part of the Employer shall cease with respect to any amounts so deducted.

D. It is agreed that the Employer and the Union will work out an arrangement mutually satisfactory by which the Employer will furnish the Business Agent of the Union a monthly record of those from whom deductions have been made, together with the amounts of such deductions. It is agreed that, if within thirty (30) days from the date the Employer has furnished such list to the Business Agent of the Union no claim of error is made, such list, as well as the amounts deducted, shall become final and conclusive for all transactions or deductions during the period of such list.

E. The Employer, having hereinbefore agreed to make dues collections for the Union, shall do so only as long as a person is actually employed by the Employer, and the Union agrees that when an employee returns to work after a layoff or an absence for good cause the Employer will make the schedule of deductions in the event of arrears as does on the part of the employee. It is expressly understood that the Employer assumes no liability and shall not be liable for the collection or payment to the Union of any dues during any time that an employee is not actually working for the Employer and actually on the payroll of the Employer.

F. It is further agreed that the Employer shall not be held responsible in any cases where dues are not deducted through clerical error of the Employer or where employees have insufficient earnings to make such deductions, or where the Employer is not notified that such deductions should be made prior to the payday.

G. The form of the Assignment mentioned in A. above shall be as follows:

ASSIGNMENT OF WAGES TO COVER CHECK-OFF OF UNION DUES AND INITIATION FEES

TO C&H SUGAR COMPANY, INC. (PAYROLL DEPARTMENT):

I hereby assign to SWU #1 (the Union), from wages earned or to be earned by me as your employee, the following sums:

a. In payment of my Union initiation fee, the sum of $......... to be paid from wages due me on the first payday on roll.

20

b. A sum per month to be paid from the wages due me on the first and second payday of each calendar month, starting with day one of any employment, equal to the monthly membership dues uniformly required by the Union as a condition of retaining membership therein.

The within assignment of wages to the Union is hereby substituted for any and all wage assignments previously executed by me.

This assignment shall remain in full force and effect through my employment or until the termination of the Collective Bargaining Agreement between C&H and the Union.

Date.............................................

Number..........................................

Name............................................

SS#.............................................

Signature.......................................

SECTION XIX

UNION REPRESENTATIVES

A. Access to Premises

Officials and representatives of Union and its International shall be permitted to talk on the job with employees subject to this agreement for the purpose of ascertaining whether or not this agreement is being observed by all parties and to assist in handling grievances. This privilege shall be exercised so that no time is lost to the Employer unnecessarily. If the privilege extended by this clause is abused, the Employer may make it contingent upon permission first being granted by the Director of Personnel and Industrial Relations.

B. Stewards

1. The Employer recognizes the right of the Union to designate Shop Stewards and alternates. The authority of Shop Stewards and alternates so designated by the Union shall be limited to, and shall not exceed, the following duties and activities:

a. The investigation and presentation of grievances in accordance with the provisions of the collective bargaining agreement;

b. The transmission of such messages and information which shall originate with, and are authorized by the local Union or its officers, provided such messages and information have been reduced to writing, or if not reduced to writing, are of a routine nature and do not involve work stoppages, slowdowns, refusals to handle goods, or any other interference with the Employer's business. When not obtaining permission from their respective supervisors, shall be permitted to leave their respective stations for the purpose of handling grievances and other proper Union business relating to this agreement. Such permission shall not be unreasonably withheld, it being the parties' intent to resolve grievances as soon as possible. As soon as practicable, a Shop Steward will report to their supervisor the length of time. When handling the grievance. All time used by Shop Stewards in the handling of grievances during working hours shall be paid

21

for by the Employer, it being understood, however, that such privilege will not be abused.

2. Union shall designate the appropriate number of Shop Stewards, up to a maximum of 30, who shall represent the union on plant premises.

3. Each Union representative shall function for the Union with the least possible interference with or interruption to their regular duties. They shall, however, be free to perform their Union representation in an independent manner and without fear that their individual relations with the Employer may be affected or jeopardized in any degree by any action taken by them in good faith in their representative capacity.

4. Union representatives shall not absent themselves from their job unless the performance of their job or jobs related to their job will not be impaired, and then only upon reporting out and in to their supervisor.

C. Attendance At Grievances

Officials and representatives of Union and its International may be present at all stages of the grievance procedure.

D. Union Absences

1. Employees, not exceeding three (3) in number, chosen by the Union to attend to Local Union business outside the plant, shall, with the permission of the management, be granted leave of absence without pay not exceeding thirty (30) days.

2. Employees, not exceeding three (3) in number, who are elected or appointed to a full-time position with the Local Union, shall be given written authority to be absent without pay for the period of such term of office or appointment. Upon one week's notice of any such employee's desire to again return to work for this Company, the employee shall be returned to his former Company's employment without reduction in their seniority, status or pay except as such reduction may be made for all employees of comparable status who have not been absent under the terms of this provision.

SECTION XX

GRIEVANCE PROCEDURE

A. When differences or complaints arise between Employer and the Union, or between Employer and any employee or employees, concerning changes made in existing working conditions, the interpretation and application of this agreement, or a claimed violation of this agreement, there shall be no suspension of work on account of such dispute, but it shall be disposed of according to this Section. Grievances must be filed within a period of ten (10) days following the occurrence of the incident complained of, except where by mutual agreement, due to the importance of the grievance, the time limit is extended. An earnest effort shall be made to settle all such grievances immediately by each of the following enumerated steps of the grievance procedure, each enumerated step to be exhausted before resorting to the next:

FIRST STEP:

By presentation of the grievance to the supervisor of the aggrieved employee or employees in the presence of the appropriate Shop Steward and conference between such employee or employees, Shop Steward and supervisor who will endeavor to settle the grievance no later than twenty-four (24) hours after it has been called to their attention.

22

SECOND STEP:

If the grievance is not settled under the First Step, above, it shall immediately (and in no case later than forty-eight (48) hours after the disposition under such First Step) be submitted to the department manager concerned or one or more of their designated representatives. Within seventy-two (72) hours after the grievance is so submitted to them, the department manager concerned shall give to an appropriate Union representative their decision with respect to the grievance.

THIRD STEP:

If the grievance is not settled under the Second Step, above, it shall immediately (and in no case later than forty-eight (48) hours after its disposition under such Second Step) be submitted to the Manager of Human Resources or a designated representative. Employees or persons involved in a grievance may, upon request of either party, be called as witnesses, but not more than two (2) witnesses shall be called at a time, and the number of witnesses shall not be unreasonable.

Within seventy-two (72) hours after the grievance is so submitted to the Manager of Human Resources, the Manager shall give to an appropriate Union representative a decision with respect to the grievance. If the issue is not resolved upon conclusion of this Third Step, and the Union desires to further pursue the grievance, a representative of the Union shall reduce the grievance to writing. Whereupon, the Manager of Human Resources will deliver to the Union a written decision with respect to the grievance.

When an appropriate Union representative alleges a violation of past practice, the grievance shall be immediately referred to the Third Step. In those cases, within twenty-four (24) hours, the Manager of Human Resources shall give to an appropriate Union representative a decision.

B. Employer Grievance

Any grievance which the Employer may have against the Union or any of its members shall be presented to the Union by the Manager of Human Resources or a designated representative.

In the event that any such grievance of the Employer is not satisfactorily adjusted within five (5) days after such presentation, or in the case of an alleged violation of Section XXI within twenty-four (24) hours after such presentation, the Employer may demand arbitration.

C. Grievance Resolution Committee

1. Any grievance arising under this agreement which has not been adjusted as outlined in Paragraphs A and B, above (except violations of Section XXI) may be submitted to the Grievance Resolution Committee. Such Committee shall be composed of the Manager of Human Resources, the manager of the department in which the grievance originated, and two (2) members selected by the Union.

This Committee will have the authority to settle all grievances submitted to it by whatever means it deems appropriate.

2. Any grievance arising between Employer and Union which is not settled under Section XX A. or B. as submitted to the Grievance Resolution Committee provided written Notice of Appeal is given no later than ten (10) days following the conclusion of the Third Step. If given by the Employer, the notice shall be delivered to the Secretary-Business Agent of the Union at the Union's business office; if given by the Union, the notice shall be delivered to the Manager of Human Resources of the Employer at Crockett refinery. If Notice of Appeal is not given within the agreed time, the right of appeal shall be forfeited.

23

3. If the grievance is initiated by the Employer, the Grievance Resolution Committee shall meet at the request of the Employer's Manager of Human Resources; if a grievance is initiated by the Union, the Grievance Resolution Committee shall meet at the request of the Union's Secretary-Business Agent. A meeting of the Grievance Resolution Committee shall be requested within five (5) days from the date on which Notice of Appeal is given, otherwise the grievance shall be considered abandoned.

4. The Grievance Resolution Committee shall meet within five (5) days after a meeting is requested by either party as herein provided, except that no meeting shall be held on a Saturday, Sundays or holidays unless by mutual consent.

If the Grievance Resolution Committee members selected to represent the party against whom the grievance is filed fail to meet within the agreed time, then the grievance as stated in Notice of Appeal shall be considered to be upheld and the complaining party entitled to the remedy claimed.

5. If the Grievance Resolution Committee does not agree upon a settlement of the grievance, either party may demand mediation. Mediation will be conducted by American Intermediation Service. The party demanding mediation shall notify the other within fifteen (15) days after the conclusion of the Third Step, Grievance Resolution Committee meeting or the Employer's grievance presentation, as the case may be. Thereupon, the grievance shall be referred to the mediator. All costs of the mediation shall be borne equally by both parties.

6. If mediation does not result in a settlement of the grievance, either party may demand arbitration as outlined in Paragraph D. below.

D. Arbitration

If a grievance shall not have been satisfactorily settled, either party may demand arbitration as follows:

The party desiring arbitration shall notify the other within fifteen (15) days after the conclusion of the Third Step, Grievance Resolution Committee meeting, or the Employer's grievance presentation, as the case may be. Thereupon, the grievance shall be referred for decision to the Arbitrator. The Arbitrator shall have the authority to make such decision and award as the facts and circumstances may warrant, subject to the limitations of this agreement, but the Arbitrator shall not add to, subtract from, alter or change the scope or terms of the agreement. The decision of the Arbitrator shall be final and binding upon the parties hereto, and the parties agree to abide by such decision. All costs of the Arbitrator (other than counsel fees) shall be borne equally by both parties.

E. All of the time limits set forth in this Section XX or elsewhere in this agreement relating to grievances are exclusive of Saturdays, Sundays and holidays and may be further extended by written consent and approval of both parties.

F. No claims (including claims for back wages) by the Union in behalf of an employee against the Employer shall be valid for a period prior to the date the grievance is presented in accordance with the grievance procedure, unless the circumstances of the case made it impossible for the Union to know that grounds for such a claim prior to the date, in which case the claim shall be limited retroactively to fifteen (15) days prior to the date the claim was first presented. Notwithstanding the above, where a claim concerns whether the proper established rate is paid an employee, the claim may be made retroactively to the execution date of this labor agreement.

g. No decision of the Arbitrator or of the Arbitrator in one case shall create a basis for a retroactive adjustment in any other case prior to the date of presentation of such specific claim in accordance with the grievance procedure.

24

H. The Arbitrator shall be selected as follows:

Promptly following execution of this agreement, the Union and the Employer shall jointly request the Director of the Federal Mediation and Conciliation Service to nominate a panel of eight (8) Arbitrators. If any of these eight (8) is removed from the panel, then the Director will at that time designate such additional names as may be necessary to complete a panel of eight (8) Arbitrators. From the panel so designated Employer and Union shall each strike two (2) names, and the remaining names shall constitute the list from which the Arbitrator will be selected by lot until an available Arbitrator is procured. Except by mutual consent of the parties, no person shall be designated as Arbitrator in two (2) consecutive arbitrations.

I. Arbitration proceedings shall be commenced and concluded with all reasonable speed, it being the desire of the parties that prompt answers be secured to any questions submitted to arbitration. If the party demanding arbitration fails or refuses to proceed to arbitration within the forty-five (45) days following its arbitration demand, its grievance shall be considered abandoned, provided that if the arbitration hearing is delayed for a reason beyond its control, then the arbitration shall be held within fifteen (15) days following the ending of such reason or be considered abandoned.

SECTION XXI

STRIKES, LOCKOUTS AND WORK STOPPAGE

A. There shall be no strike, lockout or work stoppage for the life of the Contract.

B. Refusal to cross a legitimate picket line shall not be a demand a violation of this agreement. A legitimate picket line is one established and maintained by BWU #1 or any other union, acting independently of the said union, about the premises of the Employer with whom it is engaged in a bona fide dispute over wages, hours or working conditions of the Employer with whom it has been certified or recognized as the collective bargaining representative. Collusive picket lines, jurisdictional picket lines, hot cargo picket lines, secondary boycott picket lines, and demonstration picket lines regardless of the union by which any such line is established, are not legitimate picket lines within the meaning of this agreement.

C. The Union will give the Employer seventy-two (72) hours notice in writing of its intention to recognize a legitimate picket line in order to permit the Employer to safely terminate operations and secure off the plant.

SECTION XXII

PENSIONS

A. A pension agreement exists between the parties covering the period from June 1, 2006 to 12:00 midnight, May 31, 2009.

B. The Employer will provide a Profit Sharing Thrift Plan for its employees. All wages, including wages paid for overtime, will count for purposes of 401(k) deferrals.

SECTION XXIII

HEALTH AND WELFARE

A Health and Welfare Agreement exists between the parties covering the period June 1, 2006 to May 31, 2009.

25

## SECTION XXIV

### GROUP LIFE INSURANCE

A. The Employer will provide Group Life Insurance to its employees to the same extent, in the same amounts, and subject to the same conditions as now provided in Paragraph C. below).

B. Employees may opt to purchase additional life insurance coverage on a pre-tax basis.

C. The amount of group life insurance will be reduced 8% per year for those employees who continue to work beyond normal retirement age (age 65).

D. The Employer will provide employees who retire under the C&H Retirement Plan from September 1, 1955 through May 31, 1973 with life insurance coverage of $1,000 at no cost to employees. The Employer will provide employees retiring under the C and H Retirement Plan on June 1, 1973 or thereafter, life insurance coverage of $2,500 at no cost to employees.

## SECTION XXV

### REFINING OPERATIONS

A. The Employer will have the sole right to determine when and if the refinery will operate and at what rate of melt.

B. The management reserves the right to schedule the work of all departments and sections throughout the Refinery. Nothing herein contained shall be interpreted to prevent the Company from operating in accordance with the normal practice of the Company, and the Company shall exclusively have the right to determine the extent to which its plant or department (in whole or in part), shall be operated, suspended, shutdown or changed, or production reduced or increased. Both parties further agree that nothing in this contract shall hinder the efficient operations of the plant.

Except as otherwise limited by specific provisions in this agreement, the management of the Refinery shall be vested exclusively in the Company, including but not limited to the direction of the working forces; the right to hire, the right to suspend or discharge employees for just cause; the right to relieve employees from duty because of lack of work or other reasonable cause; the right to set shift schedules, and the right to transfer employees from one area of the department or duty to another.

C. The Employer will make every effort to operate the refinery continuously on a year round basis. In order to do so the Employer will, when necessary: (1) reduce the melt to the lowest level it deems economically feasible to avoid canceling regularly scheduled operating days; or (2) shut down for a period of not less than one or more full work weeks. In the event the Employer believes that canceling regularly scheduled operating days, or one or more full weeks is required, it shall first consult with the Union. In case of such shutdown, employees will be laid of and called back as station and department conditions require and according to Section XIV.

26

## SECTION XXVI

### SUPPLEMENTARY UNEMPLOYMENT COMPENSATION PLAN

A. Any employee with plant seniority of one (1) year or more who is laid off because of a plant shutdown other than a shutdown described in Paragraph B. below shall, subject to the provisions of this Plan, have any state unemployment insurance compensation benefits to which they are eligible supplemented by the Employer as follows:

1. For the first two (2) weeks of unemployment within any benefit year, no supplemental benefits.

2. For the third through the 27th weeks of unemployment within any benefit year, a supplemental benefit which (before deductions therefrom for Federal income taxes withheld, social security contributions, and California Unemployment Disability Insurance, as required by law), when added to their state benefit for such weeks, shall equal 65% of their regular take-home pay.

3. For weeks of unemployment thereafter, within the benefit year, no supplemental benefits.

B. Supplemental benefits, shall not be paid during plant shutdowns caused by any cause beyond Employer's control. Examples of such causes are listed in Paragraph B. 2. of Section XXV.

C. Supplemental benefits shall not be payable under this Plan as to any week of unemployment for which state benefits are not payable, nor after twenty-seven (27) weeks of layoff from the Employer within a benefit year.

D. No supplemental benefits shall be payable under the Plan until such time as, under California law, supplemental benefits as provided by this Plan may be paid without affecting the entitlement of recipients to state benefits. Each of the parties hereto shall use its best efforts to urge and assist in the enactment of appropriate laws of the State of California to enable the payment of supplemental benefits as herein provided without affecting the entitlement of recipients to state benefits.

E. As used herein:

1. "State benefit" means the full amount of unemployment compensation benefits payable to an employee under the California Unemployment Insurance Program for a week of unemployment, or which would have been payable for such week but for the employee's receipt of wages or compensation from a person other than the Employer.

2. "Benefit year" shall have the same meaning as under the California Unemployment Insurance Program.

3. An employee's "regular take-home pay" is the rate of the job held immediately prior to the plant shutdown, as shown by Exhibit B, reduced by all withholdings and taxes required or imposed by law and all amounts which the employee has authorized to be deducted from their pay for employee benefit plans. In the case of daily rated jobs, pay shall be computed on the basis of a forty-(40) hour week.

4. A "week of unemployment" under this Plan shall coincide with a week of unemployment as determined for purposes of the California Unemployment Insurance Program.

Nothing contained in this Section XXVI is intended to modify any other provision of this agreement.

27

## SECTION XXVII

### WORKERS' SAFETY COMMITTEE

A. The Employer will continue its Workers' Safety Committee as in the past with representation from each department in which there are SWU members as follows:

| | |
|---|---|
| Operations Department | 2 Members |
| Maintenance Services Department | 2 Members |
| Technical Operations Department | 1 Member |
| Industrial Relations Department | 1 Member |
| Stores Section | 1 Member |

B. The Union will have the option of selecting three (3) members of this committee as follows:

One of the Operations Department members

One of the Maintenance Services Department members

One of the members on a rotational basis from either Technical Operations, Industrial Relations or Stores Section

C. If for any year the Union does not exercise its option in the selection of any or all of the three (3) members provided for in B. above, the members of the Safety Committee will be selected by the departments, as in the past.

## SECTION XXVIII

### DEFINITION OF EMERGENCY

For purposes of this agreement, the word "emergency" is defined as "a sudden, generally unexpected occurrence or set of circumstances demanding immediate action."

## SECTION XXIX

### TERM OF THIS AGREEMENT

This agreement shall be effective June 1, 2006 and shall remain in full force and effect until 12:00 midnight, May 31, 2009.

At least sixty (60) days prior to June 1, 2009, both parties shall submit written proposals for amendment or renewal of this agreement and negotiations shall be commenced forthwith.

The Union agrees to give the Employer and the Employer agrees to give to the Union written notice at least three (3) regularly scheduled melt days before any strike or lockout becomes effective. This notice shall specify the effective time of the contemplated strike or lockout. This obligation shall survive the term of this agreement.

IN WITNESS WHEREOF the parties hereto have executed this Agreement effective June 1, 2006.

SUGAR WORKERS UNION NO. 1
SIU of NA - AFL-CIO

Signed:

/s/ Jens Aagaard

/s/ Surinder M. Bhanot

/s/ Cory Wilson

/s/ Mohinder Nahal

/s/ Larry Williams

/s/ Kevin J. Abel

/s/ Steven Stricklen

C&H SUGAR COMPANY, INC.

Signed:

/s/ Robert M. Jendovitz

/s/ Kyle Stradleigh

EXHIBIT "A"

PERSONAL TIME OFF

When operating conditions permit granting it, an employee shall receive up to 16 hours of personal time off per year with no questions asked. If management approves additional personal time off requested by the employee, the employee shall be required to use his or her banked vacation. PTO will be in 1 hour increments

30

EXHIBIT "B"

TO COLLECTIVE BARGAINING AGREEMENT

EFFECTIVE JUNE 1, 2006

SINGLE RATE DAILY RATED CLASSIFICATIONS

**$16.99 Per Hour**

Packaging Laborer
Process Laborer
Stores Laborer
Electrician Helper

**$17.13 Per Hour**

Power Station Trainee

**$18.27 Per Hour**

Laboratory Technician - Level 1
Packaging Technician - Level 1
Process Technician - Level 1
Truck Checker - Level 1
Stores Technician - Level 1

SINGLE RATE BIWEEKLY RATED CLASSIFICATIONS

**$19.40 Per Hour**

Laboratory Technician - Level 2
Packaging Technician - Level 2
Process Technician - Level 2
Truck Checker - Level 2
Stores Technician - Level 2

**$20.53 Per Hour**

Laboratory Technician - Level 3
Packaging Technician - Level 3
Process Technician - Level 3
Stores Technician - Level 3
Truck Checker - Level 3

**$22.04 Per Hour**

First Class Journeyman (all crafts)
Laboratory Technician - Level 4
Packaging Technician - Level 4
Process Technician - Level 4
Stores Technician - Level 4
Toolkeeper

**$23.16 Per Hour**

Laboratory Technician - Level 5
Maintenance Department Millwright
Millwright (all crafts)
Packaging Technician - Level 5
Process Technician - Level 5

**$23.75 Per Hour**

Centrifugal Specialist
Maintenance Department Specialist
Millwright Specialist (Maint. Dept.)
Operations Department Specialist
Packaging Specialist
Pan Specialist
Power Station Operator Specialist
Process Specialist

31

EXHIBIT "C"

A Work Sharing Program, administered through the State of California, will be in effect for the duration of this contract.

This program provides for payment of unemployment insurance benefits equal to 20% of the weekly benefit an employee is entitled to for each day of layoff after they have established a benefit year as defined by the State of California Employment Development Department (EDD).

Under the Company-Union work sharing agreement, the employee's benefit-year-beginning (BYB) date in the program will be established by the employee's first reduced workweek in a 12-month period as determined by the California Employment Development Department (EDD).

The claim forms will be initiated by the Industrial Relations Department and coordinated with the Employment Development Department of the State of California based on their guidelines and criteria.

33

## DAILY RATED RATE RANGE CLASSIFICATIONS

**Maintenance Services Department**

| | | Hourly Rate |
|---|---|---|
| General Apprentice (all crafts) | 2d Class Helper | $ 17.15 |
| | 1st Class Helper | 17.51 |
| | 5th Class Improver | 18.08 |
| | 4th Class Improver | 18.65 |
| | 3d Class Improver | 19.22 |
| Millwright Steps (all crafts) | 3d Class Improver | $ 19.22 |
| | 2d Class Improver | 19.78 |
| | 1st Class Improver | 20.35 |
| | 3d Class Journeyman | 20.91 |
| | 2d Class Journeyman | 21.47 |

## BIWEEKLY RATE RANGE CLASSIFICATIONS

**Maintenance Services Department**

| | | Hourly Rate |
|---|---|---|
| Power Station Operator B | 1st step | $ 18.08 |
| | 2d step | 18.65 |
| | 3d step | 19.22 |
| | 4th step | 19.78 |
| | 5th step | 20.35 |
| | top step | 20.91 |
| Power Station Operator A | 1st step | $ 22.04 |
| | 2d step | 22.61 |
| | top step | 23.16 |
| Fire Marshal | 1st step | $ 17.15 |
| | 2d step | 17.51 |
| | 3d step | 18.08 |
| | 4th step | 18.65 |
| | 5th step | 19.22 |
| | 6th step | 19.78 |
| | 7th step | 20.35 |
| | 8th step | 20.91 |
| | 9th step | 21.47 |
| | top step | 22.04 |

**Emergency Response Department**

32

# INDEX
## 2006 - 2009 CONTRACT

| Subject | Page |
|---|---|
| Arbitration | 47 |
| Back-to-Back Differential | 3 |
| Biweekly Pay | 8 |
| Check-Off | 58 |
| Christmas Award | 4 |
| Cost-of-Living Adjustment | 3 |
| Coverage of Contract | 2 |
| Curtailed Schedule | 10 |
| Days of rest, definition of | 12 |
| Differentials | |
|   Lunch period differentials | 22 |
|   Shift differential | 21 |
| Disabled Employees, reasonable accommodation for | 2 |
| Discharge, unfair | 32 |
| Double Time | 9 |
| Employment, Advancement and Retention | |
|   Governing Policy | 28 |
| Emergency, definition of | 54 |
| Emergency Work After Midnight | 9 |
| Exhibit "A", Personal Time Off | 56 |
| Exhibit "B" | 56 |
| Exhibit "C", Work Sharing Program | 59 |
| Extended Plant Shutdown, work during | 31 |
| Five hours without a meal | 14 |
| Funeral Leave | 28 |

| Subject | Page |
|---|---|
| Grievance Procedure | 43 |
| Group Life Insurance | 50 |
| Health and Welfare | 49 |
| Holidays | |
|   Designated | 18 |
|   During vacation | 27 |
|   Holidays on Sunday | 19 |
|   Holidays on Saturday | 18 |
|   Pay for | 18 |
|   Personal Holiday | 18 |
|   Work on | 12 |
| Layoffs | 30 |
| Meal Allowance | 22 |
| Meal Periods | 5 |
| Mechanization Option | 36 |
| New Employer Rate | 4 |
| New Machinery, Equipment and Methods | 34 |
| Occupations covered by contract | 1 |
| Overtime | |
|   Assignment of | 14 |
|   Cancellation | 15 |
|   Errors in Assignment of | 17 |
|   Guarantee | 14 |
|   Notice required | 14 |
|   No pay if not performed | 15 |
|   Pay for | 8 |
|   Late starting due to holiday | 10 |
|   Rotation and Equalization of | 16 |
|   Voluntary | 11 |
| Pensions | 49 |
| Personal Time Off | 56 |
| Premium Pay | 8 |
|   Computation of | 14 |
| Probationary Period | 29 |
| Promotions | 28 |

Recess Periods ............................................................. 5
Reduction in Forces ................................................... 29

| Subject | Page |
| --- | --- |
| Refining Operations | 50 |
| Report Pay | 20 |
| Return to Work, notice of | 20 |
| Safety Committee | 54 |
| Schedule | |
|   Changes of | 6 |
|   Definition | 7 |
|   Types | 6 |
| Seniority | |
|   Adjusted, definition of | 29 |
|   Appointment | 34 |
|    | 29 |
| Severance Pay | 20 |
| Shift Changes | 13 |
| Shift Differential | 21 |
| Shutdown, work during | 31 |
| Staggered hours | 14 |
| Stewards | |
|   Duties | 41 |
|   Number | 42 |
| Strikes, Lockouts and Work Stoppages | 48 |
| Successor Clause | 1 |
| Supervisors Promoted | |
|   From Bargaining Unit | 32 |
|   Appointment to | 32 |
|   Return to Bargaining Unit | 32-33 |
|   Involuntary | 33 |
|   Voluntary | 32 |
|   Status of Relief or Temporary Supervisor | 34 |
| Supervisors Performing Union Work | 2 |
| Supplementary Unemployment Compensation | 52-53 |
| Term of Agreement | 55 |

Two-hour Notice ........................................................ 15
Unfair Discharge ...................................................... 32

| Subject | Page |
| --- | --- |
| Union Representatives | 41 |
|   Access to Premises | 41 |
|   Absence of | 42 |
| Union Shop | 38 |
| Vacations | |
|   Accumulation | 22 |
|   Adjustments | 27 |
|   Leave of Absence | 25 |
|   Personal Time Off | 25 |
|   Sickness | 26 |
|   Shift Differential | 26 |
|   Union Action | 23 |
|   Eligibility | 26 |
|   Holidays during | 22 |
|   Termination Allowance | 27 |
|   Vacation Account | 26 |
|   Vacation Allowance | 24 |
|   Vacation Periods | 24 |
| Wages | 3-4 |
|   Cost-of-Living Adjustment | 3 |
|   New Employee Rate | 4 |
| Wage Rates | 56-59 |
| Work Day | 4 |
| Work Covered by Contract | 1 |
| Work Schedule | 6 |
| Work Week | 5 |
| Workers' Safety Committee | 54 |

NOTES

38

# EXHIBIT B

**MEMORANDUM**
Human Resources

 **C&H SUGAR COMPANY, INC.**

Kyle C. Stradleigh
Human Resources
Manager

830 Loring Ave
Crockett, CA 94525
www.chsugar.com

TO:       **Lawrence Ross, Business Agent, SWU #1**

FROM:     Kyle Stradleigh

DATE:     June 13, 2007

SUBJECT:  Grievance #070612
          Failure to Follow Grievance Procedure

CC:       File
          Dept. Mgr.

The Company is submitting this grievance under the terms of the Collective Bargaining Agreement ("CBA") against the Sugar Workers Union Local #1 for continued and ongoing violations of the CBA, Section XX "Grievance Procedure"

Specifically, the Sugar Workers Union Local #1 has on numerous occasions, to include as recently as June 6, 2007, June 1, 2007, and May 31, 2007, violated the Grievance Procedure as defined in Section XX, to include, but not limited to the A., First Step, and A., Second Step.

The Company requests, as a remedy to this grievance, that the Sugar Workers Union Local #1 agree to the following:

1. Recognize Section XX "Grievance Procedure" of the CBA and adhere to the defined Steps of the Grievance Procedure, to include but not limited to the "First Step", the "Second Step", the "Third Step" and all other procedures defined under Section XX of the CBA.
2. Recognize and adhere to the time limits established by the Grievance Procedure as defined in Section XX of the CBA.

The Company looks forward to your response to this grievance within the defined time limits and hopes that it can be adjusted in a satisfactorily manner.

P. 1

* * * Memory TX Result Report ( Jun.13. 2007  5:08PM) * * *

1)
2)

Date/Time: Jun.13. 2007  5:07PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 2167 | Memory TX | SWU LOCAL 1 | P. 1 | OK | |

---

Reason for error
E. 1) Hang up or line fail          E. 2) Busy
E. 3) No answer                     E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size

---

**MEMORANDUM**
Human Resources

**C&H** C&H SUGAR COMPANY, INC.

Kyle C. Stradleigh
Human Resource
Manager

TO:        Lawrence Ross, Business Agent, SWU #1
FROM:      Kyle Stradleigh
DATE:      June 13, 2007
SUBJECT:   Grievance #070612
           Failure to Follow Grievance Procedure
CC:        File
           Dept. Mgr.

830 Loring Ave
Crockett, CA 94525
www.chsugar.com

The Company is submitting this grievance under the terms of the Collective Bargaining Agreement ("CBA") against the Sugar Workers Union Local #1 for continued and ongoing violations of the CBA, Section XX "Grievance Procedure"

Specifically, the Sugar Workers Union Local #1 has on numerous occasions, to include as recently as June 6, 2007, June 1, 2007, and May 31, 2007, violated the Grievance Procedure as defined in Section XX, to include, but not limited to the A. First Step, and A. Second Step.

The Company requests, as a remedy to this grievance, that the Sugar Workers Union Local #1 agree to the following:

1. Recognize Section XX "Grievance Procedure" of the CBA and adhere to the defined Steps of the Grievance Procedure, to include but not limited to the "First Step", the "Second Step", the "Third Step" and all other procedures defined under Section XX of the CBA.
2. Recognize and adhere to the time limits established by the Grievance Procedure as defined in Section XX of the CBA.

The Company looks forward to your response to this grievance within the defined time limits and hopes that it can be adjusted in a satisfactorily manner.

# EXHIBIT C

JUN-20-2007 10:37A FROM: SWU#1 15107871776 TO:7871791 P.1/1

SUGAR WORKERS UNION LOCAL #1

641 Loring Avenue
P.O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788

C&H Sugar Company,
Human Resources
JUN 20 2007
RECEIVED

To: Kyle Stradleigh
From: Lawrence Ross
Date: June 20, 2007
Re: Employer Grievance #070612

The Union disputes and disagrees with the grievance filed by you regarding the union's alleged failure to follow the grievance procedure. The reality is that the union does comply with the grievance procedure and it is the company who is refusing to follow the grievance procedure.

Your conduct has made it clear that you do not intend to abide by the terms of the collective bargaining agreement. Furthermore, you have attempted to manipulate the steps of the grievance procedure to avoid having determinations be made on the merits of each case.

Employee Discipline Grievances

For example, with respect to the Ted Kirkpatrick grievance, you were directly responsible for suspending Kirkpatrick indefinitely pending your investigation. Accordingly, since you were responsible for imposing the discipline, the union approached you to discuss the matter. When we discussed the matter with you, you said you were still reviewing the case. We also re-raised the grievance with you and Jim Dudley the plant manager. Dudley told us that Kirpatrick would be reinstated and receive back pay. When you and Dudley failed to abide by your promises, the union filed a written grievance. Your response was that we failed to follow the steps of the grievance. Since you were responsible for the suspension and you and Dudley were responsible for the investigation, we did follow the grievance procedure by approaching you. Kirkpatrick's supervisor had nothing to do with his suspension.

In other cases involving discipline, we have complied with steps one and two. In every single case when we first raised the issue with the immediate supervisor, their response is always without equivocation"I cannot do anything you have to go to Human Resources (Which is YOU)." We then go to the step two and receive the same response"I cannot do anything, you have to go to Human Resources". We then go the third step and approach you and receive a denial. We then file the grievance and you still deny it and state it is untimely.

It is important to note that all disciplines and suspensions come from your office at your direction. Accordingly, it only makes sense that the grievances should be directed to the person responsible for imposing the discipline. Also, no grievance is ever resolved at step one and two since these supervisors have been stripped of any authority to overturn your decisions. However, the union has made every effort to follow these two steps even though they are futile. Every single supervisor always says you are the only one with any authority over these disciplinary issues.

Received Time Jun. 20. 10:44AM

JUN-20-2007 10:39A FROM: SWU#1          15107871776          TO:7871791          P.1/1



## SUGAR WORKERS UNION LOCAL





641 Loring Avenue
P.O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788
FAX (510) 787-1776

What is even more outrageous is you will speak with the union about the grievances verbally, you will say you need a few days to think about it and then you will tell us you are not changing your decision. We then file a written grievance and you deny the grievance and say it is untimely. You have made a mockery of the grievance procedure.

Grievances Regarding Terms and Conditions of Employment

On numerous occasions the union has filed grievances alleging unilateral changes to terms and conditions of employment. All changes to terms and conditions of employment are made by you. Accordingly, the union always approaches you about these changes. Also the contract specifically states that changes to past practice go directly to step three of the grievance procedure.

Supervisors have no control over changes to working conditions which are made by you. It makes absolutely no sense to approach them about these grievances since you made the changes.

Time Limits in Grievance

As to following the time limits in the grievance, you are the one who repeatedly ignores the time limits in the grievance procedure. When the union files grievances, you repeatedly violate the grievance time lines by not timely responding to grievances.

The union does abide by the steps of the grievance procedure and demands that the company also abide by the grievance procedure including taking cases to arbitration.

As such stated your memo dated June 13, 2007 cannot be recognized as a legitimate grievance as it has no merit.

Lawrence Ross

Business Agent SWU #1

C&H Sugar Company.
Human Resources

JUN 20 2007

RECEIVED

# EXHIBIT D

**MEMORANDUM**
Human Resources



**C&H SUGAR COMPANY, INC.**

Kyle C. Stradleigh
Human Resources
Manager

830 Loring Ave
Crockett, CA 94525
www.chsugar.com

TO:        **Lawrence Ross, Business Agent, SWU #1**

FROM:     Kyle Stradleigh

DATE:     June 20, 2007

SUBJECT:  Grievance #070612
          Failure to Follow Grievance Procedure
          Demand for Arbitration

CC:       File
          Dept. Mgr.

I am in receipt of your response to the subject grievance, dated June 20, 2007. It is clear from your response that the parties are unable to satisfactorily adjust the grievance.

As such, and in accordance with Section XX, B and D, the Company hereby notifies you, within the fifteen (15) day timeframe as specified in the CBA, that it is demanding arbitration. Whereas this grievance will be referred for a decision to the Arbitrator.

P. 1

* * * Memory TX Result Report ( Jun. 20. 2007  5:19PM) * * *
                                                          1)
                                                          2)

Date/Time: Jun. 20. 2007  5:19PM

| File<br>No. | Mode | Destination | Pg(s) | Result | Page<br>Not Sent |
|---|---|---|---|---|---|
| 2252 | Memory TX | SWU LOCAL 1 | P.  1 | OK | |

Reason for error
   E. 1) Hang up or line fail                    E. 2) Busy
   E. 3) No answer                               E. 4) No facsimile connection
   E. 5) Exceeded max. E-mail size

---

**MEMORANDUM**
Human Resources

**C&H SUGAR COMPANY, INC.**

Kyle C. Stradleigh
Human Resources
Manager

TO:      Lawrence Kesu, Business Agent, SWU #1

FROM:    Kyle Stradleigh

DATE:    June 20, 2007

SUBJECT: Grievance #970612
         Failure to Follow Grievance Procedure
         Demand for Arbitration

CC:      File
         Dept. Mgr.

150 Loring Ave
Crockett, CA 94525
www.chsugar.com

I am in receipt of your response to the subject grievance, dated June 20, 2007. It is clear from your response that the parties are unable to satisfactorily adjust the grievance.

As such, and in accordance with Section XX, B and D, the Company hereby notifies you, within the fifteen (15) day timeframe as specified in the CBA, that it is demanding arbitration. Whereas this grievance will be referred for a decision to the Arbitrator.

# EXHIBIT E



**SUGAR WORKERS UNION LOCAL**  **#1**

641 Loring Avenue
P.O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788
FAX (510) 787-1776



To: Kyle Stradleigh
From: Lawrence Ross
Date: June 22, 2007
Re: Grievance # 070612
    Your demand for arbitration

    Please be advised that the Union will respond to your demand for arbitration within the time frame outlined in the CBA.

Lawrence Ross

Business Agent, SWU #1

C&H Sugar Company, Inc.
Human Resources

JUN 22 2007

# RECEIVED

# EXHIBIT F

**MEMORANDUM**
Human Resources

 **C&H SUGAR COMPANY, INC.**

Kyle C. Stradleigh
Human Resources
Manager

| | |
|---|---|
| TO: | **Lawrence Ross, Business Agent, SWU #1** |
| FROM: | Kyle Stradleigh |
| DATE: | June 22, 2007 |
| SUBJECT: | Grievance #070612 |
| | Failure to Follow Grievance Procedure |
| | Demand for Arbitration |
| CC: | File |
| | Dept. Mgr. |

830 Loring Ave
Crockett, CA 94525
www.chsugar.com

On June 13, 2007 the Company filed a grievance against the Union for failing to follow the grievance procedure.

On June 20, 2007 you responded to the grievance, unable satisfactorily adjust the grievance.

On June 20, 2007 the Company provided you with notification and Demand for Arbitration.

On June 21, 2007 the Company notified you that the parties would select an Arbitrator for the subject grievance on Friday, June 22, 2007 at 11am, in conjunction with the selection of an arbitrator for the Dextor Lott termination grievance #070220

On June 22, 2007, the parties met as scheduled to select an Arbitrator. An Arbitrator (David Nevins) was selected for the Dextor Lott grievance. When the Company attempted to select an arbitrator for the subject grievance, you refused to select an arbitrator. You further claimed you did not have to select an arbitrator. You also stated that you would not select an arbitrator and that you needed to meet with SWU committee to discuss the grievance and receive permission from them to determine how you would proceed with this grievance.

You then handed me a memo on SWU letterhead, to which it read that "the Union would respond to your demand for arbitration within the time frame outlined in the CBA."

Let me remind you that this is an employer grievance. As an employer grievance, the Company does not need you or your Union committee's approval to have the grievance arbitrated. Furthermore, the CBA does not contain language within the grievance procedure that establishes a time frame for you to respond to the Company's demand for Arbitration.

As such, your refusal to select an arbitrator is a continued and ongoing violation of the grievance procedure and a refusal to arbitrate this grievance.

# EXHIBIT G



**SUGAR
WORKERS
UNION
LOCAL**



641 Loring Avenue
P.O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788
FAX (510) 787-1776



To: Kyle Stradleigh
From: Lawrence Ross
Date: June 25, 2007
Re: Grievance # 070612

   In response to your memo dated June 22, 2007, please refer to the memo that the Union sent to you dated June 22, 2007 whereas we informed the company that we would respond to the companies demand for arbitration within the timeframe outlined in the CBA.

                    Lawrence Ross

                    Business Agent SWU #1

# EXHIBIT H

**MEMORANDUM**
Human Resources



**C&H SUGAR COMPANY, INC.**

Kyle C. Stradleigh
Human Resources
Manager

830 Loring Ave
Crockett, CA 94525
www.chsugar.com

TO:         **Lawrence Ross, Business Agent, SWU #1**

FROM:       Kyle Stradleigh

DATE:       July 2, 2007

SUBJECT:    Grievance #070612
            Re: your memo dated June 25, 2007

CC:         File
            Dept. Mgr.

In response to your June 25, 2007 memo regarding the subject, I am asking for you to identify the alleged timeframe that you claim is outlined in the CBA for responding to our demand for arbitration. Including the specific Section, subsection and language that you are referring to in you alleged claim of a timeframe.

# EXHIBIT I



**SUGAR WORKERS UNION LOCAL**



641 Loring Avenue
P.O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788
FAX (510) 787-1776



To:    Kyle Stradleigh
From:  Lawrence Ross
Date:  July 6, 2007
Re:    Your memo dated July 2, 2007

In response to your July 2, 2007 memo regarding the subject, The CBA states on page one (1) Witnesseth that the Employer is willing to recognize the Union as the representative of the employees. The Executive Board makes all of the decisions for the Union when the body is absent. The Executive Board will meet on July 10, 2007 at which time a decision regarding the issue will be made.

C&H Sugar Company, Inc.
Human Resources

JUL 0 6 2007

RECEIVED

Received Time Jul. 6.  2:42PM